Filed 9/20/21  In re I.T. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re I.T. et al., Persons Coming Under the Juvenile Court Law. | |
| | D078807 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. Nos. EJ4520, EJ4520A-B) |
| Plaintiff and Respondent, | |
| v. | |
| T.T. et al., | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, T.T.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant, C.W.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

T.T. (Father T.) and C.W. (Mother) appeal from orders of the juvenile court entered at the jurisdiction and disposition hearing removing their children, eight-year-old I.T. and six-year-old V.M., from their custody pursuant to Welfare and Institutions Code section 361, subdivision (c)(1).[1] Mother also appeals from an order entered at the same hearing removing her youngest child, one-year-old I.W., from her custody pursuant to section 361, subdivision (c)(1). I.W. has a different father, C.S. (Father S.), who is not a party to this appeal.

Father T. and Mother contend the juvenile court erred by finding the San Diego County Health and Human Services Agency (the Agency) complied with the inquiry provisions of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA). We conclude the Agency conducted sufficient inquiry and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

Because the scope of this appeal is limited to ICWA compliance, we provide an abbreviated summary of the dependency proceedings and focus on the facts relevant to the ICWA findings. "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn.1.)

Father T. and Mother's relationship ended in 2017. Between January and March 2020, the Agency received three child welfare hotline referrals indicating I.T. and V.M. were present during domestic violence disputes in the parents' respective homes. Two incidents were between Father T. and his then-girlfriend, and one incident involved Mother and Father S. The director of I.T. and V.M.'s prior school confirmed the children's exposure to domestic

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

disputes. According to the school director, the children would often arrive to school tired and claimed they had not slept because their parents were fighting.

The Agency filed juvenile dependency petitions under section 300, subdivision (b)(1) on behalf of I.T. and V.M. on March 11, 2020, alleging their parents failed or were unable to protect and supervise them by periodically exposing them to violent confrontations.

In the associated detention report, the Agency reported Mother told the investigating social worker on February 10, 2020 that the maternal grandmother might have Indian heritage in the Black Foot tribe. Mother was not registered in any tribe and did not participate in any Indian traditions.

That same day, Father T. reported to the social worker that the paternal grandfather may have Indian heritage in the "Oneta" tribe from New York. Father T. was not registered in any tribe and did not participate in any Indian traditions. Because Father T. was in foster care as a child, he did not have any contact information for the paternal grandfather or anyone in his biological family who could provide more information about his family's ancestry.

At the hearing on March 11, 2020, Mother's counsel advised the juvenile court that Mother had submitted an ICWA-020 form indicating she might have Blackfoot ancestry. Father T. also submitted an ICWA-020 that same day, indicating he may have ancestry in the "(NY) Oinita Tribe." According to Father T.'s counsel, Father T.'s maternal relatives could have more information about his ancestry. Counsel advised the court that Father

T. would complete an ICWA-030 after the hearing.[2] At the close of the hearing, the court ordered the Agency to "use continued efforts to investigate the Indian Child Welfare Act with reasonable inquiry . . . ."[3]

In the jurisdiction and detention report, dated May 26, 2020, the Agency indicated Father and Mother denied having any new information pertinent to ICWA. According to the report, Mother's possible Indian heritage came from the maternal great-grandmother, who Mother believed had Blackfoot heritage and had lived on tribal lands. The maternal grandmother was identified as a potential lead for more information about the maternal family's ancestry. The Agency indicated it would continue to make ICWA inquiries.

In the addendum report, the Agency reported that social worker Yolanda Davalos Botani, an ICWA specialist, spoke with Mother on April 6, 2020, who indicated heritage in the Blackfoot tribe. Mother provided the ICWA specialist with her personal information along with the names and dates of birth for maternal grandmother, maternal great-grandmother, maternal great-great-grandmother, and maternal great-great-great-grandfather.

The next day, the ICWA specialist left a voicemail and an e-mail for the ICWA coordinator for the Blackfeet Tribe of Montana. The Blackfeet's ICWA coordinator responded and advised the ICWA specialist to send "inquiry with information" to the tribe via certified mail.

---

[2] There is no evidence in the record that Father ever submitted the ICWA-030 form.

[3] Following the March 11, 2020 hearing, the courts closed for in-person hearings due to COVID-19 emergency measures. All subsequent juvenile court proceedings were conducted virtually via videoconference or telephone.

The ICWA specialist contacted Father T. to discuss his possible Indian heritage on June 3, 2020. Father T. reported he did not have much information due to the death of his mother when he was young. Father T. indicated he heard from an "auntie" that the family belonged to the "Oneida Tribe of New York," and he also indicated heritage belonging to "Blackfoot Indians." Father T. provided the ICWA specialist with his full name and place of birth, his mother's full name, and what he remembered to be his aunt's last name. He reported this was all the information he had, and he had no contact information for any family members. The ICWA specialist advised Father T. that she would contact the tribe with this information but that they would probably need more.

The ICWA specialist contacted Mother that same day. Mother confirmed she did not know if any of her ancestors had lived on a reservation, attended an Indian school, received medical services from an Indian health clinic, or were enrolled in the tribe. Mother added that the tribe she belonged to was Cherokee and not "Blackfoot," based on what the maternal great-aunt recently told the maternal grandmother. Mother stated she did not have "much contact" with her aunt but was going to try to get more information. The ICWA specialist asked Mother to provide the maternal great-aunt with the ICWA specialist's contact information, so the maternal great-aunt could contact the ICWA specialist if she felt comfortable providing more information about the family's Indian heritage.

The next day, the ICWA specialist left a voicemail for the Nation Clerk for the Oneida Indian Nation. The ICWA specialist indicated she was seeking to verify a claim of heritage in the "Oneida Tribe of New York" and requested a return call. On June 23, 2020, the ICWA specialist sent an e-mail to the Nation Clerk explaining the Agency was investigating Father T.'s

potential heritage in the Oneida Indian Nation. The e-mail included the information about the paternal family members Father T. had provided.

On June 23, 2020, the ICWA specialist sent a letter to the Black Feet Tribe of the Blackfeet Indian Reservation of Montana, explaining that Father T. reported possible heritage belonging to the "Blackfoot Indians" and the Oneida Indians from New York. The letter provided biographical information for I.T., V.M., and Father T., along with the first and last names for paternal grandmother and paternal great-aunt. The ICWA specialist asked the tribe to contact her if the tribe needed any additional information to respond to the inquiry.

That same day, the ICWA specialist sent letters to the Eastern Band of Cherokee Indians, the Cherokee Nation, and the United Keetoowah Band of Cherokee Indians to inquire about the maternal family's potential Indian heritage. The letters explained Mother and maternal grandmother had indicated heritage belonging to the "Cherokee Indians." Each letter included biographical information for I.T. and V.M., Mother, maternal great-grandmother, maternal great-great grandmother, maternal great-great-great-grandmother, and maternal great-great-great-grandfather. The ICWA specialist advised the tribes to contact her if any additional information was needed.

The ICWA specialist also sent a letter to the ICWA coordinator of the Blackfeet Tribe of Montana in April 2020, before Mother reported the family's heritage was Cherokee. This letter provided the tribe with biographic information for the children, Mother, and maternal family members.

The parties attended a pretrial settlement conference on July 2, 2020, for I.T. and V.M.'s contested jurisdiction and disposition hearing. The juvenile court referenced the Agency's inquiry efforts, but assumed the

6

Agency would continue to inquire into the children's Indian ancestry now that a potential Cherokee heritage had been identified. County counsel advised the court that it would continue the ICWA inquiry.

The parties reached a settlement and agreed to a family maintenance plan for I.T. and V.M. at a hearing held a few weeks later. County counsel raised ICWA at the hearing and noted the Agency had contacted the maternal grandmother, who indicated that her aunt was Cherokee. According to counsel, the maternal grandmother was unwilling to provide the aunt's phone number or information. As for Father's potential Indian heritage, counsel stated Father did not have contact information for any of his relatives. Counsel requested the juvenile court make a finding about the adequacy of the Agency's inquiry efforts. The court indicated it would not rule on the sufficiency of the Agency's ICWA inquiry because "the word Cherokee came up . . . and we haven't ruled the Cherokee Nation out." The court noted it was unnecessary at that time to rule on ICWA since the parties had agreed to a family maintenance plan and the children were remaining in the parents' custody.[4]

Meanwhile, Mother gave birth to I.W. in May 2020. In December 2020, police responded to a dispute between Mother and Father T., after Father T. threw objects off a balcony and hit Mother in the head. Both I.T. and V.M. were present during the dispute, and Mother was holding I.W. when she was hit in the head.

On January 12, 2021, the Agency filed supplemental petitions pursuant to section 387 for I.T. and V.M. The petitions alleged the previous family

---

[4]     The minute orders for that hearing, however, included a finding that the Agency had made reasonable inquiry regarding ICWA.

maintenance plan had not been effective in the protection of the children and requested placement of the children in foster care.

That same day, the Agency filed a petition under section 300, subdivision (b)(1) for I.W., alleging Mother and Father S. had failed or were unable to protect and supervise I.W. by exposing him to violent confrontations.

There was a detention hearing on January 14, 2021, regarding I.T. and V.M.'s section 387 petition and I.W.'s section 300 petition. Mother, Father T., and Father S. were present telephonically and represented by counsel. Maternal grandmother was also present. Two social workers and a social worker supervisor were present by videoconference.

Mother's counsel stated he had reviewed the dependency process with Mother, including her "constitutional, statutory, trial and hearing rights." Counsel stated: "Mother indicates no Indian Ancestry and would submit on any request to elevate [Father S.'s] paternity status today." Father S.'s counsel indicated Father S. had no Indian heritage. The juvenile court replied that it would note Mother and Father S.'s position on ICWA and found "at this time, that ICWA does not apply based on the information provided to the Court . . . ." Father T.'s potential claim to Indian ancestry was not addressed at this hearing.

On January 21, 2021, the ICWA specialist sent a letter to the Nation Clerk for the Oneida Indian Nation requesting a response to the Agency's earlier inquiries. The letter provided information regarding Father's claim of heritage in the Oneida Indian Nation from New York; biographical information for I.T. and V.M., Father, paternal grandmother, and paternal great-grandmother; and the paternal great-aunt's full name.

The Agency's addendum report for the pretrial settlement conference set for March 29, 2021, contained ICWA inquiry updates. All five tribes—the Blackfeet Tribe of Montana, Cherokee Nation, United Keetoowah Band of Cherokee Indians, Eastern Bans of Cherokee Indians, and Oneida—had determined I.T. and V.M. did not meet the definition of an "Indian Child" under ICWA.

Several tribes provided information about the requirements for enrollment. For instance, enrollment in the United Keetowah Band of Cherokee Indians requires an individual to have at least one-quarter Keetowah (Cherokee) blood and a direct ancestor on the 1949 Keetoowah Base Roll or the Dawes Roll. Similarly, the Blackfeet Tribe requires one-quarter Blackfeet blood for enrollment. The response from the Oneida Indian Nation also indicated enrollment required one-quarter Indian blood or the enrollment of the child's mother.

At the pretrial status conference on March 29, 2021, Mother and both fathers were present and represented by counsel. County counsel referred to the documentation in the addendum report containing the responses from the tribes and requested the juvenile court find that ICWA did not apply. After counsel for the parents did not have anything to add regarding ICWA, the court indicated it had reviewed the responses from the various tribes and determined that ICWA did not apply.

At a contested jurisdiction and disposition hearing held on April 7, 2021, a different juvenile court judge found the allegations in all three of the children's petitions true, removed the children from their respective parents' custody, placed the children in foster care, and ordered reunification services for the parents. Regarding ICWA, the juvenile court referred to the pretrial settlement conference judge's finding that ICWA did not apply. The court

9

asked Father T.'s counsel if Father T. had ever claimed Indian heritage, and when counsel was not immediately sure, Father T. responded that he had. The court then noted that Father T. had provided insufficient information for the Agency to conduct further inquiry into Father T.'s potential Indian ancestry. As to Mother, the court expressed its understanding that Mother indicated she might have Blackfeet heritage, but it was determined that the children were not eligible for enrollment in the Blackfeet tribe. The court then asked the parties to confirm whether the court's understanding was correct. County counsel confirmed that it was, and no party disputed the court's summary of prior events related to ICWA. The court then reaffirmed the finding that ICWA did not apply.

Father T. and Mother timely appealed.

DISCUSSION

Father T. and Mother's sole contention on appeal is that the juvenile court's finding that ICWA did not apply is not supported by substantial evidence. Father T. contends there was insufficient inquiry into I.T. and V.M.'s Indian ancestry after both parents claimed possible Indian ancestry. Mother joins in Father T.'s arguments regarding the two older children. She also contends there was insufficient inquiry into I.W.'s potential Indian ancestry based on her assertion of Indian heritage.

## I. *Relevant Law and Standard of Review*

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' [Citation.]" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) ICWA

10

established minimum standards courts are required to follow before placing a child in foster care or terminating parental rights to ensure Indian tribes receive notice "where the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a); *Isaiah W.,* at p. 8.) California adopted the main provisions of ICWA into California statutory law in 2006. (*In re Autumn K.* (2013) 221 Cal.App.4th 674, 703–704.)

The Agency and the juvenile court have "an affirmative and continuing duty" in every dependency proceeding to determine whether a child is an Indian child. (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a); see *Isaiah W.*, *supra*, 1 Cal.5th at p. 14.) An " 'Indian child' is defined as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); accord § 224.1, subd. (b) [adopting ICWA's definition of " 'Indian Child' "].)

Following the enactment of new federal regulations concerning ICWA, California made conforming amendments to its own statutes, which went into effect January 1, 2019.[5] (25 C.F.R. § 23.107(c) ; 81 Fed. Reg. 38803 (Jun. 14, 2016) ; *In re A.W.* (2019) 38 Cal.App.5th 655, 662, fn. 3; Assem. Bill No. 3176 (2017–2018 Reg. Sess.) Aug. 28, 2018.) Under the current statutory scheme, California contains "three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian

---

[5] The underlying juvenile dependency proceedings were initiated after January 1, 2019, and the parties do not dispute that the new statutory scheme applies to these proceedings.

status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)]).") (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*).)

There is a "reason to believe" a child is an Indian child whenever the court or the Agency has "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1); see also § 224.2, subd. (d)(1)-(6); *In re T.G.* (2020) 58 Cal.App.5th 275, 290.) After a "reason to believe" that an Indian child is involved has been established, further inquiry regarding the possible Indian status of the child is required. (§ 224.2, subd. (e).) The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership; and (3) contacting tribes and anyone else that might

have information regarding the child's membership or eligibility in a tribe.[6] (§ 224.2, subd. (e)(2).)

If the inquiry establishes a "reason to know" an Indian child is involved in the dependency proceeding, notice must be provided to the tribe. (§ 224.3, subds. (a), (b).) Alternatively, the juvenile court may determine that ICWA does not apply by finding the Agency's further inquiry and due diligence was "proper and adequate" and no "reason to know" whether the child is an Indian child was discovered. (§ 224.2, subd. (i)(2).)

We review a finding that ICWA does not apply for substantial evidence. (*In re J.S.* (2021) 62 Cal.App.5th 678, 689.) We resolve all conflicts in favor of affirmance, and we must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them. (*In re A.M.* (2020) 47 Cal.App.5th 303, 314 (*A.M.*).)

II. *Substantial Evidence Supports the Juvenile Court's ICWA Findings*

Father T. contends the claims of Indian ancestry on the maternal and paternal sides of the family established a reason to believe I.T. and V.M. were Indian children, triggering a duty for the Agency and the juvenile court to conduct further inquiry. He contends the Agency's further inquiry was inadequate because the Agency "made no efforts at inquiry in this case beyond speaking to the parents."

Father T. and Mother's statements regarding possible Indian ancestry were sufficient to establish a reason to believe I.T. and V.M. were Indian children, and thus the Agency was required to conduct further inquiry.

---

[6] The sharing of information with the tribes at this stage is distinct from the formal ICWA notice requirement, which is triggered only where there is a "reason to know" as opposed to a "reason to believe" the child is an "Indian child." (*D.S., supra,* 46 Cal.App.5th at p. 1049; see also *In re M.W.* (2020) 49 Cal.App.5th 1034, 1047 ["[A] 'reason to believe' the minor is an Indian child triggers requirements less rigorous than does a 'reason to know.' "].)

13

However, the record does not support the assertion that the Agency's inquiry efforts were limited to speaking with the parents, as the record indisputably shows the Agency's inquiry included contact with five separate tribes regarding I.T. and V.M.'s potential tribal affiliation. Pursuant to section 224.2, subdivision (e)(2)(C), the Agency must contact "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." The Agency's contact with the tribe "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (*Ibid.*)

There is substantial evidence to show the Agency complied with these requirements. The record contains numerous letters and e-mails the Agency sent the tribes potentially connected to Father T. and Mother's claims of Indian heritage, including to the Eastern Band of Cherokee Indians, the Cherokee Nation, the United Keetoowah Band of Cherokee Indians, the Oneida Indian Nation, and the Blackfeet Tribe of Montana. These written communications contained information regarding the parents' claims of Indian heritage, along with biographical information for I.T., V.M., and pertinent family members. Moreover, even though the parents did not specifically identify the Blackfeet Tribe of Montana, the Agency nevertheless contacted this tribe based on the parents' claims of "Blackfoot" heritage. Then, by the time the juvenile court ruled on the sufficiency of the Agency's ICWA inquiry, all five tribes had determined that I.T. and V.M. did not qualify for enrollment. This contact with the pertinent tribes constitutes substantial evidence that the Agency complied with its obligations under section 224.2, subdivision (e)(2)(C).

14

The Agency has a further obligation under section 224.2, subdivision (e)(2)(A), to interview extended family members. An " 'extended family member' " is defined as a child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

Father T. contends the Agency made no "meaningful effort" to contact his extended members, specifically his mother or aunt. He contends his lack of contact with his biological family did not absolve the Agency of its duty to interview paternal relatives.

However, the record shows there were no reasonable leads for the Agency to pursue that could have led to further information regarding I.T. and V.M.'s Indian ancestry on the paternal side of the family. The record demonstrates Father T.'s mother—I.T. and V.M.'s paternal grandmother—is deceased, which Father T. concedes in his reply brief. Additionally, Father T. became an orphan at a young age, he was raised in foster care, and he had no contact information for any biological family members. Although Father T. heard through the children's paternal great-aunt that his family may have Indian ancestry, all he could remember was his aunt's last name. No paternal relatives were present for any hearings in the juvenile court or otherwise participated in these dependency proceedings.

Thus, the only living paternal relative Father T. identified as a potential source of information is the paternal great-aunt. However, a great-aunt does not fall within the definition of an "extended family member" under ICWA, which only includes the child's "grandparent, aunt or uncle, brother or sister, brother-in-law- or sister-in-law, niece or nephew, first or second cousin or, stepparent." (25 U.S.C., § 1903(2); § 224.1, subd. (c).)

15

Additionally, further inquiry into a child's Indian ancestry is not required under section 224.2 if the parents fail to provide "any information requiring follow[-]up." (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1161 (*S.B.*).) "The Agency is not required to 'cast about' for information or pursue unproductive investigative leads. [Citation.]" (*D.S., supra*, 46 Cal.App.5th at p. 1055.) As explained by the appellate court in *A.M., supra,* 47 Cal.App.5th 303, the Agency's duty of further inquiry is not limitless. There, the mother who claimed Indian ancestry was raised in foster care, her parents were deceased, and she had no contact information for any family members. (*Id.* at p. 323.) The *A.M.* court concluded that under those circumstances, the Agency was not required to conduct further inquiry, because the mother had failed to provide a "viable lead that would require [the Agency] 'to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status.' [Citation.]" (*Ibid.*) Based on the record in this case, specifically Father T.'s representations that he had no viable leads that would have enabled the Agency to contact paternal relatives regarding the paternal family's Indian ancestry, substantial evidence supports the juvenile court's conclusion that the Agency complied with its further inquiry obligations concerning V.M. and I.T.'s paternal ancestry.

As to Mother's claims of Indian ancestry, Father T. contends the Agency did not make "any effort" to contact maternal family members. He contends the Agency should have contacted the maternal grandmother, maternal great-grandmother, maternal great-aunt, or "any of the other individuals whose information was provided by mother."

The maternal grandmother meets the definition of an "extended family" within the meaning of ICWA and is therefore an individual the Agency was

16

required to interview. (25 U.S.C. § 1903(2); § 224.1, subd. (c).) Contrary to Father's assertion, however, the record shows the Agency fulfilled its duty of inquiry. According to the Agency's letters to the tribes, the ICWA specialist spoke with the maternal grandmother about the maternal family's ancestry. Maternal grandmother indicated the family had heritage belonging to the Cherokee Indians, not to the Blackfeet. Maternal grandmother also indicated she was not enrolled in the tribe and did not know if anybody in the family was an enrolled member. This evidence supports a finding that the Agency satisfied its duty to contact the maternal grandmother.[7]

Father T. also identifies other maternal relatives as potential sources of information the Agency should have pursued, such as maternal great-grandmother and maternal great-aunt. However, these family members do not meet the definition of an " 'extended family member' " under ICWA, which is limited to the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c).) Great-aunts and great-grandparents are not included in the definition. (*D.S.*, *supra*, 46 Cal.App.5th at p. 1053 [indicating that great-grandparents do not qualify as "extended family members" within the meaning of ICWA].)

Further, there is evidence in the record to show the Agency attempted to interview the maternal great-aunt. In June 2020, the ICWA specialist contacted Mother to discuss whether Mother had any new information

7     At the hearing on July 17, 2020, County counsel confirmed the Agency had "reached out" to maternal grandmother. However, we need not rely on these statements by counsel at the hearing as evidence regarding the Agency's contact with maternal grandmother, because as discussed *ante*, there exists other uncontradicted evidence in the record to demonstrate that the Agency contacted maternal grandmother directly regarding her Indian ancestry.

regarding her Indian ancestry. Mother reported that the maternal great-aunt recently told the maternal grandmother that the maternal family was affiliated with the Cherokee. However, Mother did not have "much" contact with her aunt and was planning to call her for more information. The ICWA specialist advised Mother to provide the ICWA specialist's information to her aunt, and to have her aunt call the ICWA specialist directly if she felt comfortable providing more information about the family's heritage.

Father T. contends the ICWA specialist's tactic was "simply insufficient" and does not satisfy the Agency's inquiry requirements. However, Father provides no authority, and we have found none independently, to indicate the Agency's strategy for establishing contact with the maternal great-aunt was inadequate. The Agency's further inquiry obligation is "not an absolute duty to ascertain or refute Native American ancestry" (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413), and the duty of inquiry does not extend to individuals who refuse to talk to the Agency (*A.M.*, *supra*, 47 Cal.App.5th at p. 323; *In re K.M.* (2009) 172 Cal.App.4th 115, 118–119). Here, the Agency attempted to elicit further information regarding the maternal family's ancestry through the maternal great-aunt but was unsuccessful. Under these circumstances, the Agency did what could reasonably be expected for it to meet its duty of further inquiry regarding the maternal family's claim of Indian ancestry.

Father T. also contends that Mother's denial of Indian ancestry through counsel at I.W.'s hearing on January 14, 2021 was not dispositive. He argues that under the Agency and juvenile court's "affirmative and continuing" duty to determine whether any of the children involved in the proceedings were Indian children, the Agency and the juvenile court

18

committed "unequivocal error" by failing to question Mother about why her claim of Indian ancestry had changed.

The juvenile court's orders entered on April 7, 2021, do not indicate the court relied on Mother's denial of Indian ancestry when it determined that ICWA did not apply. Instead, the orders regarding I.T. and V.M. specifically indicate the Agency had conducted adequate further inquiry to identify and work with the pertinent tribes to verify whether the children or their biological parents were eligible for membership. Additionally, the orders in all three children's cases noted that a prior juvenile court had determined that ICWA did not apply "based on documentation submitted by the Agency." These orders are consistent with the court's discussion at the hearing on April 7, 2021, regarding Father T. and Mother's claims of Indian ancestry. At the April 7 hearing, the court confirmed with the parties the Agency's ICWA inquiry efforts and concluded ICWA did not apply "based on the Agency's notice and the fact that there's no reason to believe that the children are Native American Children.[8]" Mother's denial of Indian ancestry at the earlier hearing was never discussed.

Even if the juvenile court had relied on Mother's denial of Indian ancestry as a basis for concluding that ICWA did not apply, this would not constitute reversible error. This court recently held in *In re Charles W.* (2021) 66 Cal.App.5th 483 (*Charles W.*) there was substantial evidence to support a finding that ICWA did not apply based on a parent's denial of Indian ancestry through counsel. In *Charles W.*, the mother's counsel represented to the juvenile court that she had no Indian ancestry. (*Ibid.*) In a prior dependency proceeding involving the minor's two older full siblings,

_____

8    Because formal ICWA-030 was never ordered or sent in this case, the court appears to have been referring to the Agency's contact with the pertinent tribes as part of its further inquiry obligation under section 224.2.

19

the mother had claimed Indian ancestry, but the juvenile court found that ICWA did not apply. (*Ibid.*) When minor's counsel raised the issue of the mother's prior claims of Indian ancestry in the prior proceedings, mother's counsel confirmed the mother was not claiming Indian ancestry. (*Ibid.*) The appellate court in *Charles W.* concluded the juvenile court was entitled to rely on the statements from mother's counsel, particularly since the mother was present and in apparent agreement with her counsel's representations. (*Ibid.*) The court reasoned that mother's counsel, as an officer of the court and practitioner in juvenile dependency matters, would not have "misreported Mother's ancestry or misunderstood the implications of his report." (*Ibid.*)

Father T. contends *Charles W.* is distinguishable, because there is no evidence to support Mother's denial of Indian ancestry. This is incorrect. Mother's counsel disclaimed Mother had Indian ancestry at the hearing on January 14, 2021. By that time, the Agency's inquiry into I.T. and V.M.'s potential tribal affiliations had been ongoing for nearly one year. Mother first indicated she may have Indian heritage, specifically in the "Black Foot" tribe, in February 2020. However, she reported she was not registered to any tribe and did not participate in any Indian traditions. By June 2020, Mother believed the correct tribe was Cherokee and not "Black Foot" as she had originally reported. She also did not know if any of her ancestors had lived on a reservation, attended an Indian school, received medical services from an Indian health clinic, or were enrolled in the tribe. Although the Agency interviewed the maternal grandmother to gather more information about the maternal lineage, the maternal grandmother was not an enrolled member in a tribe and did not know if any family members were enrolled. The Agency also contacted the pertinent tribes directly, and the tribes ultimately

20

concluded that I.T. and V.M. did not meet the definition of an "Indian Child" under ICWA.[9]

Against this backdrop of substantial inquiry into the maternal ancestry leading up to the January 17 hearing, we conclude Mother's denial of Indian ancestry through her counsel established no reason to believe any of the children had Indian ancestry through their maternal lineage. Like in *Charles W.*, Mother was present at the hearing when her counsel denied she had any Indian heritage. (*Charles W., supra,* 66 Cal.App.5th at p. 483.) This was the same counsel who had represented Mother throughout I.T. and V.M.'s proceedings. Further, no one at the hearing objected when Mother's counsel represented that Mother had no Indian ancestry. This included fathers and their respective counsels, the children's counsel and guardian ad litem, maternal grandmother, and three social workers. The record shows that Father T., in particular, was not afraid to interject regarding the existence of familial claims to Indian ancestry, an issue he directly raised with the juvenile court at another hearing.

---

[9] The Agency received responses from the Eastern Band of Cherokee Indians, United Keetoowah Band of Cherokee Indians, and the Blackfeet Tribe in the Summer of 2020, before the January 14 hearing. The response from the Cherokee Nation was received shortly after the hearing in February 2021.

Although the Agency and juvenile court did not directly question Mother about her ancestry at the January 17 hearing, this was not required under the circumstances. "While the [Agency] and the trial court have a duty to inquire into the child's Indian ancestry, a parent has superior access to this information. Moreover, a parent has a right to counsel, including appointed counsel, if necessary (. . . § 317, subds. (a), (b)), who has not only the ability but also the duty to protect the parent's rights under the ICWA." (*S.B., supra,* 130 Cal.App.4th at pp. 1159–1160.) In this case, the denial of Indian ancestry was made through Mother's counsel, an officer of the court charged with advocating for Mother's interests in these proceedings. Prior to disclaiming that Mother had Indian heritage, Mother's counsel stated he had reviewed the dependency process with Mother, including her "constitutional, statutory, trial and hearing rights." Following this court's holding in *Charles W.*, it was reasonable for the court to rely on the representations from Mother's counsel, as "there is no reason to believe he misreported Mother's ancestry or misunderstood the implications of his report." (*Charles W., supra,* 66 Cal.App.5th at p. 490.) Rather than disregard counsel's statements, the court was entitled to accept counsel's representations as a basis for determining that no further inquiry into the maternal ancestry was required.

## DISPOSITION

The juvenile court's findings and orders are affirmed.

IRION, Acting P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.